# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JACQUELYN GIPSON,

       **Plaintiff,**

    **v.**
                  **Civil Action 2:18-cv-315**
                  **Judge Sarah D. Morrison**
                  **Magistrate Judge Chelsey M. Vascura**

DEPT. OF REHABILITATION AND
CORRECTIONS, CORRECTIONAL
RECEPTION CENTER,

       **Defendant.**


## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 23), Plaintiff's Response in Opposition (ECF No. 35), and Defendant's Reply (ECF No. 36). The matter is now ripe for a decision.

Plaintiff Jacquelyn Gipson is an African-American female employed as a Corrections Lieutenant with the Defendant, Ohio Department of Rehabilitation and Corrections ("ODRC") Correctional Reception Center ("CRC"). Lt. Gipson filed this action alleging that CRC subjected her to sex discrimination, race discrimination, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. (Compl., ECF No. 1.) For the reasons that follow, Lt. Gipson's sex discrimination claim is **DISMISSED** and CRC's Motion for Summary Judgment is **GRANTED**.

# I.    BACKGROUND

Lt. Gipson alleges that CRC unlawfully discriminated and retaliated against her. The following tangible employment actions form the basis for her claims: a negative performance evaluation in March 2017; a March 2017 disciplinary action; her non-selection for a promotion to Captain on four occasions in 2017; her reassignment to third shift in September 2017; and two April 2018 disciplinary actions.[1] (Compl.) The Court will review the facts relevant to each employment action, in turn.

## A.  The March 2017 performance evaluation and written reprimand lead to Lt. Gipson's April 2017 EEOC charge.

On January 12, 2017, Lt. Gipson was assigned to special duty supervising the CRC mail room and visitation center between the hours of 7:00 AM and 3:00 PM. (Jacquelyn Gipson Dep. Vol. I 26:16–20, ECF No. 21.) That day, Lt. Gipson received a telephone call at her post from Lieutenant Mike Antle, urgently requesting a series of documents that Lt. Gipson had in her possession. (*Id*. at 49:18–21.) Lt. Gipson copied those documents and carried them to Lt. Antle in his office, which he shared with Acting Major Vernon Fisher, Lt. Gipson's direct supervisor. (*Id*. at 49:21–23.) Maj. Fisher was also in the office at the time. (*Id*. at 49:23.)

A verbal altercation ensued. Lt. Gipson alleges as follows: She expressed to Lt. Antle that his request was outside the standard procedure and asked whether standard procedure had changed. (Gipson Dep. Vol. I 49:23–50:15.) Lt. Antle responded that his project was an effort to

---

[1] In her Complaint, Lt. Gipson also makes vague reference to CRC taking retaliatory action against her husband, an employee in the maintenance department. (Compl. ¶ 25.) Lt. Gipson makes no further factual allegations in this regard. In its Motion for Summary Judgment, CRC points out that Lt. Gipson stated in her deposition "I've discussed this with my husband and he says he doesn't feel they've been retaliatory," and expressed an intent to withdraw the claim. (Def.'s Mot. for Summ. J. at 12. *See also*, Jacquelyn Gipson Dep. Vol. II 71:21–72:13, ECF No. 22.) The Court therefore considers any claim stemming from retaliatory action directed towards Lt. Gipson's husband to be withdrawn. *See Brooks v. Ohio Bell Tel. Co.*, No. 1:12-cv-814, 2013 WL 3776673, at *4 (N.D. Ohio July 17, 2013).

assist another CRC employee. (Gipson Dep. Vol. I Ex. 7, ECF No. 21-1 at 33.) Maj. Fisher then "became irate and aggressive" and began yelling at Lt. Gipson. (Gipson Dep. Vol. I at 51:2–8.) He ordered Lt. Antle to leave the room. (*Id*. at 50:24–51:2.) Now alone in the office, Maj. Fisher continued to yell at Lt. Gipson and made repeated threats, including "I'll have your job, I'll make sure you're moved," and "I'll make sure you're not promoted." (*Id*. at 51:2–8, 51:21–23. *See also* Gipson Dep. Vol. I Ex. 7; Gipson Dep. Vol. I Ex. 9, ECF No. 21-1 at 39.) After some time, Lt. Gipson protested that she did not have to "stand here and allow him to belittle me, degrade me, disrespect me," left the administrative office, and went into the prison yard. (*Id*. at 51:9–12.) Maj. Fisher followed her and "got in [her] face an[d] continued to yell and scream" in the presence of inmates and staff. (Gipson Dep. Vol. I Ex. 7. *See also* Gipson Dep. Vol. I 51:13–21, 52:3–9.) When Maj. Fisher turned to leave, Lt. Gipson went to the bathroom to compose herself. (Gipson Dep. Vol. I 52:10–22.) Afterward, she went to the office of CRC Inspector Mavis Hall and recounted the incident. (*Id*. at 53:1–17.) Inspector Hall called Deputy Warden of Operations ("DWO") George Frederick, who instructed Lt. Gipson to file an incident report. (*Id*. at 57:24–58:4.)

Lt. Gipson filed her incident report on January 13, 2017. (Gipson Dep. Vol. I Ex. 9.) In addition to describing the previous day's events, she wrote:

> Please be advised I am the only black female Lieutenant at CRC, and based on past practice Major Fisher has established a pattern of hostility, aggression, and disrespect toward females of color under his supervision.

(*Id*.) Upon receiving the incident report, DWO Frederick referred the matter for investigation by an outside third party and informed Lt. Gipson that she would be under his direct supervision—and not Maj. Fisher's—during the pendency of the investigation. (George Frederick Decl. ¶ 5, ECF No. 23-2.) On February 10, 2017, the third-party investigator issued her Investigation Summary Report finding that "both Acting Major Fisher and Lieutenant Gipson violated the

Standards of Employee Conduct when they engaged in a verbal altercation that started in the Major's office and extended to the yard." (Shelbie Smith Decl. Ex. 5, ECF No. 23-1.)

Now under DWO Frederick's supervision, Lt. Gipson received her annual performance evaluation from DWO Frederick on March 16, 2017. (Frederick Decl. ¶ 6, Ex. 1.) He marked that Lt. Gipson "Meets Expectations" in all competency areas, but marked "Needs Improvement" in the Competency Summary and included the following comment:

> Lt. Gipson does a good job with supervising the mail room/visitation however needs to show a more knowledge based approach to performing duties of a Lieutenant. Being a supervisor with the tenure that Lt. Gipson has it is expected that there would be a more proactive approach to assisting the overall operation of the institution as opposed to taking a reactionary approach.

(Frederick Decl. Ex. 1, ECF No. 23-3 at 6.) DWO Frederick included comments throughout the evaluation, ostensibly identifying areas for Lt. Gipson to improve in her job performance, but which she characterizes as "derogatory." (Gipson Dep. Vol. I 100:1–7; Frederick Decl. Ex. 1.) Lt. Gipson disagreed with DWO Frederick's evaluation and met with him on March 20, 2017, to discuss the matter. (Gipson Dep. Vol. I 102:19–104:12.) DWO Frederick explained his assessment of Lt. Gipson's job performance as follows:

> Lieutenant Gipson is a long term employee having held her current position since 1999. Based upon my personal knowledge and observation of her in the workplace, Gipson's knowledge base is not on par with many of her peers as it pertains to good correctional security knowledge of basic policies and taking a proactive approach to identifying and developing solutions for matters in her direct scope of supervision. I specifically explained to Gipson that she does a good job when directed to follow up and address issues, but rarely takes a proactive stance without being prompted to do so, thus this is an area in which she needs improvement.

(Frederick Decl. ¶ 8.)

On March 23, 2017, Warden Shelbie Smith met separately with Lt. Gipson and Maj. Fisher to discuss the third-party investigator's findings related to the January 12, 2017 incident. (Smith Decl. ¶ 17.) In those meetings, Warden Smith issued virtually identical written

reprimands to Lt. Gipson and Maj. Fisher for violating the Standards of Employee Conduct by showing "discourteous treatment to a fellow staff member while in a verbal altercation." (*Id*.; Smith Decl. Ex. 6 and 6a.)

Shortly thereafter, on April 11, 2017, Lt. Gipson filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that she was discriminated against on the basis of her race, sex, and age. (Gipson Dep. Vol. I Ex. 7.) In support of the charge, she described the verbal altercation, including Maj. Fisher's threats of "I will have you replaced . . . I'll have your job, I'll make sure you're moved," and stated:

> It is important to note that Major Fisher is a Caucasian male and has a history of issues with black female employees in the past. . . . Major Fisher has created a hostile work environment for staff, inmates, and me because I am a 55 year old black female. Based on past practice with both myself and other coworkers, Major Fisher has established a pattern of hostility, aggression and disrespect toward black females.

(*Id*.) Lt. Gipson further alleged that her evaluation from DWO Frederick constituted retaliation for "filing the Incident Report against Major Fisher." (*Id*.) CRC was made aware of the EEOC charge on April 21, 2017. (Penn Dec. ¶ 19.) The EEOC issued Lt. Gipson a Right to Sue letter on January 17, 2018. (Compl. Ex. 1.)

**B. Lt. Gipson was not selected for any of the four Captain positions to which she applied in 2017.**

Over the course of 2017, four Captain positions were filled at CRC. (Penn Decl. ¶ 5.) The candidate selection process was identical for each of the four positions. First, interested individuals submitted application materials online. (*Id*. at ¶ 6–8.) A shared services center compiled all eligible applications and sent them to CRC Personnel Director Terry Penn. [2] (*Id*. at

---

[2] The Court notes that Ms. Penn experienced a name change during the relevant period. To avoid confusion, she is referred to as Ms. Penn throughout.

¶ 9.) Personnel Director Penn screened the applications for minimum qualifications. (*Id*. at ¶ 10.) The minimum qualifications for each Captain position included:

- High school diploma or GED; 3 years training or 3 years experience in enforcement of security methods for detention of felons or consumers who are criminally insane in controlled environment; 12 months training or 12 months experience in supervisory principles/techniques; or

- High school diploma or GED; 12 months experience as Correction Lieutenant; or

- High school diploma or GED; 2 years experience as Correction Sergeant/Counselor; or

- Equivalent of Minimum Class Qualifications for Employment noted above.

(Penn Decl. Ex. 1–4.) Personnel Director Penn sent those applications on to the subject matter expert ("SME") designated for that posting. (Penn Decl. at ¶ 10.) A SME is an employee who possesses a high level of knowledge in the relevant area. (*Id*. at ¶ 11.) The SME used a standardized screening form to "objectively assign points relative to an applicant's education, experience, certifications held, and current state employment as reflected on his or her application." (*Id*. at ¶ 12.) Personnel Director Penn then identified a "Primary Applicant Pool," consisting of the ten highest scoring applicants (including ties) or the top one-third of applicants (including ties), whichever is less, in accordance with ODRC policy. (*Id*. at ¶ 13. *See also* Penn Dec. Ex. 5, ECF No. 23-3 at 22.) The applicants in the Primary Applicant Pool had the opportunity to interview with a panel of between two and five CRC administrators. (*Id*. at ¶ 14.) The interview panel presented two-to-three finalists to the Warden for her ultimate selection. (*Id*. at ¶ 16.) The Warden then recorded the reasons for her selection on an ODRC Recommendation for Personnel Selection ("RPS") form. (*Id*.)

The four Captain positions at issue, along with the relevant dates and applicable SME, are as follows:

| Position[3] | Date Open | Date Closed | Date Filled | SME |
|---|---|---|---|---|
| CAPT 1 | January 1, 2017 | January 20, 2017 | April 18, 2017 | DWO Frederick |
| CAPT 2 | June 21, 2017 | July 3, 2017 | August 9, 2017 | DWO Frederick and Major Nutter |
| CAPT 3 | August 21, 2017 | August 31, 2017 | October 16, 2017 | Major Nutter |
| CAPT 4 | October 25, 2017 | November 6, 2017 | December 11, 2017 | Major Nutter |

(Smith Decl. Ex. 1–4; Frederick Decl. ¶ 3; Robert Nutter Decl. ¶ 3.) Matthew Church, a Caucasian male, was hired for CAPT 1. (Smith Decl. Ex. 1; Gipson Dep. Vol. I Ex. 2, Def.'s Supp. Resp. to Pl.'s Interrog. No. 7, ECF No. 21-1 at 5.) The RPS form reflects that Church was selected because he "has an Associates degree in Human Services and Corrections as well as an Associates degree in Juvenile Services and Corrections. He has 19 years experience in corrections and has worked in three different institutions. . . . He is currently working on his Bachelor Degree in Public Administration." (Smith Decl. Ex. 1.) Sherrie Patrick, a Caucasian female, was hired for CAPT 2. (Smith Decl. Ex. 2; Gipson Dep. Vol. I Ex. 2, Def.'s Supp. Resp. to Pl.'s Interrog. No. 7.) The RPS form states that Patrick was selected because she "has 7 years experience as a Correction Lieutenant and over 24 years experience in Custody with the Department." (Smith Decl. Ex. 2.) Michael Thompson, an African-American male, was hired for CAPT 3. (Smith Decl. Ex. 3; Gipson Dep. Vol. I Ex. 2, Def.'s Supp. Resp. to Pl.'s Interrog. No. 7.) The RPS form reflects that Thompson was selected because he "has a Bachelor's degree in Criminal Justice from Youngstown State University. He has 3 years experience as a Correction Captain and 14 years experience as a Correction Lieutenant." (Smith Decl. Ex. 3.) Finally, James

---

[3] The Court has defined each position as such for ease of reference.

White, a Caucasian[4] male, was hired for CAPT 4. (Smith Decl. Ex. 4; Gipson Dep. Vol. I Ex. 2, Def.'s Supp. Resp. to Pl.'s Interrog. No. 7.) The RPS form indicates that White "has an Associates degree in Applied Science Law Enforcement Technology. He is currently enrolled in a Bachelor Program at Ohio University in Criminal Justice. Mr. White has been in the corrections working with Adult and Juvenile Corrections since 2005." (Smith Decl. Ex. 4.)

Lt. Gipson applied for all four Captain positions. (Penn. Decl. ¶ 5.) It is undisputed that she satisfied the minimum qualifications for each position. (*Id*. at ¶ 17.) Lt. Gipson began as a CO at CRC in 1994 and was promoted to Lieutenant in 1999. (Id. at ¶ 3.) She completed high school and some post-secondary education but has not received any post-secondary degrees. (Gipson Dep. Vol. I 13:4–14:22.) Lt. Gipson was included in the Primary Applicant Pool for CAPT 1 and CAPT 4 but was not among the finalists presented to the Warden. (*Id*. at ¶ 17–18.) Lt. Gipson believes that she was not selected for promotion to Captain due to her race and gender. (Gipson Dep. Vol. II 32:21–22.) She asserts that CRC has "never promoted a black female to [C]aptain." (*Id*. at 32:21–33:1.)

### C. Lt. Gipson was re-assigned to third shift supervisor in September 2017.

Effective as of September 16, 2017, Lt. Gipson's then-supervisor, Major Robert Nutter, re-assigned Lt. Gipson to third shift supervisor. (Nutter Decl. ¶ 5.) Maj. Nutter transferred to CRC from another correctional institution on May 15, 2017. (*Id*. at ¶ 1.) Maj. Nutter explained his reasoning as follows:

---

[4] The Court notes that there is some disagreement as to James White's race. Captain White describes himself as Caucasian in his deposition. (James White Dep. 8:1, ECF No. 29.) CRC's responses to interrogatories also reflect that Captain White is Caucasian. (Gipson Dep. Vol. I Ex. 2, Def.'s Supp. Resp. to Pl.'s Interrog. No. 7, ECF No. 21-1 at 5.) However, Lt. Gipson believes Captain White to be "bi-racial." (Gipson Dep. Vol. II 16:7.) Construing the facts in the light most favorable to Lt. Gipson, as it must, the Court will consider Captain White to be a Caucasian male.

Based upon my person observations of Lieutenant Gipson, it was my determination that she did not exhibit adequate skills to properly and effectively manage this area where members of the public were regularly present visiting inmates. I specifically recall an incident where a correction officer was engaged in an argument with a visitor. Instead of intervening to defuse the situation and address the visitor's question/concerns, Lieutenant Gipson remained in the Officer's Station without taking control of the situation. As a result of these observations, and due to the occurrence of various supervisory vacancies . . . , I made the decision to re-assign Lieutenant Gipson to Third Shift effective September 16, 2017. Neither Gipson's salary nor her number of hours worked were reduced as a result of the re-assignment.

(*Id*. at ¶ 5.) The referenced supervisory vacancy was created when Sherrie Patrick was promoted to Captain in August 2017. (*Id*. at ¶ 6.)

In support of her assertion that that the re-assignment was due to her race and gender, Lt. Gipson states that she was not aware of any other supervisors whose shift was changed at that time. (Gipson Dep. Vol. II 113:21–23, 114:17–19.)

**D. Lt. Gipson received two disciplinary actions in April 2018.**

In April 2018, Lt. Gipson received a disciplinary action for failure to timely complete a use of force investigation. (Gipson Dep. Vol. II Ex. 12, ECF No. 22-1 at 25.) She also received another for failure to timely complete a leave request. (Gipson Dep. Vol. II Ex. 15, ECF No. 22-1 at 47.) Lt. Gipson believes that these disciplines were issued unfairly or were unfairly excessive, on account of her race and gender. (*See* Pl.'s Resp. to Def.'s Mot. for Sum. J. at 8.)

As to the first, Lt. Gipson was assigned a UOF file for investigation on October 10, 2017. (Gipson Dep. Vol. II Ex. 12, ECF No. 22-1 at 27.) The investigation had an initial deadline of November 20, 2017. (*Id*.) The CO involved in the underlying incident was on disability leave, and therefore unavailable for an interview, for at least some of the time between October 10 and November 20, 2017. (*Id*. at 34.) On November 22, 2017, Lt. Gipson requested an extension to complete the investigation. (*Id*. at 27.) She was granted an extension to November 28, 2017. (*Id*.) Two months later, on January 30, 2018, DWO Frederick found the UOF file in Lt. Gipson's

mailbox, incomplete. (*Id.* at 30.) DWO Frederick filed an incident report that day. (*Id.* at 28.) On April 16, 2018, Warden Smith issued Lt. Gipson a paid two-day working suspension for the violation. (Smith Decl. Ex. 10, ECF No. 23-1 at 100.)

As to the second, a CO under Lt. Gipson's supervision submitted a leave request on January 12, 2018. (Smith Decl. Ex. 8, ECF No. 23-1 at 82.) CRC supervisors are expected to process leave requests within 24 hours. (Penn Decl. ¶ 3.) On this occasion, Lt. Gipson did not open the leave request until January 25, 2018, causing the CO's paycheck to be short. (Smith Decl. Ex. 8, ECF No. 23-1 at 82.) Personnel Director Penn filed an incident report as a result. (*Id.*) Lt. Gipson was issued a written corrective counseling on April 17, 2018. (Smith Decl. Ex. 11, ECF No. 23-1 at 101.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary

judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.    ANALYSIS

As an initial matter, the undersigned notes that Lt. Gipson previously indicated her intent to file a stipulation of dismissal as to her claim for sex discrimination. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at n. 43.) To date, she has not done so. Nonetheless, Lt. Gipson's failure to address or defend that claim in her Response to Defendant's Motion for Summary Judgment constitutes a waiver of that claim. *See Brooks*, 2013 WL 3776673, at *4 (holding that plaintiff's failure to address certain claims in her opposition must be viewed as abandonment of those claims). Lt. Gipson's sex discrimination claim is therefore **DISMISSED**.

Turning now to the subject Motion for Summary Judgment, CRC argues that it is entitled to summary judgment on all remaining claims because (A) Lt. Gipson has not exhausted her administrative remedies as to any of the alleged adverse employment actions except the March 16, 2017 performance evaluation and March 23, 2017 discipline, and (B) the March 16, 2017 performance evaluation and March 23, 2017 discipline do not constitute adverse employment actions sufficient to establish a *prima facie* case of unlawful discrimination or retaliation. The Court will first consider which claims Lt. Gipson has properly exhausted before analyzing the merits of those claims.

### A.  Lt. Gipson failed to exhaust her administrative remedies as to the April 2018 disciplines.

Any individual alleging unlawful employment practices under Title VII must first file an administrative charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1). The charge must be

"sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). Generally, a Title VII plaintiff cannot bring suit for claims that were not a part of his EEOC charge. *See* 42 U.S.C. § 2000e-5(f)(1); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974). As the Sixth Circuit has explained it:

> This rule serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation and persuasion. *See* [*Alexander*, 415 U.S. at 44]. Hence, allowing a Title VII action to encompass claims outside the reach of the EEOC charge would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role. At the same time, because aggrieved employees—and not attorneys—usually file charges with the EEOC, their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge. *See Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006). As a result, "whe[n] facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998).

*Younis v. Pinnacle Airline, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). *See also Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th Cir. 2010) ("[T]he fact that we liberally construe EEOC charges filed by *pro se* complainants does not meant that a broad reading may not, or should not, be given in cases where a plaintiff has counsel.") (internal quotation omitted) (internal citation omitted). In other terms, "the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 380 (6th Cir. 2002) (internal quotations omitted). This standard has become known as the "expected scope of investigation" test (or, the ESOI test). Under the ESOI test, "a plaintiff [may] bring a claim in court for an *act* that occurred any time after [the filing date of the EEOC charge], so long as that act would be reasonably expected to fall within the scope of the original investigation." *Watson v. Ohio Dep't of Rehab. & Corr.*, 690 F. App'x 885, 890 (6th Cir. 2017) (citing *Delisle v. Brimfield Tp. Police Dep't*, 94

F. App'x 247 (6th Cir. 2004)) (emphasis in original). However, "if an aggrieved employee files a second (or successive) EEOC charge, then he must include in it all acts and claims that had occurred since the previous EEOC charge or else he waives them." *Id*. Further, employment actions taken after the receipt of a Right to Sue letter from the EEOC are necessarily outside the scope of the agency's investigation. *See Flowers v. Potter*, 2008 WL 697630 at *10–11 (S.D. Ohio 2008) (granting summary judgment on claim of age discrimination for constructive discharge which occurred after EEOC issued Right to Sue letter), *Schaefer v. U.S. Postal Serv.*, 254 F.Supp.2d 741, 752 (S.D. Ohio 2002) ("Because the alleged retaliation occurred after [plaintiff's] receipt of the Right to Sue Letter, the Court cannot conclude that [p]laintiff's retaliation claim fell within the scope of the agency investigation of his [ ] discrimination claim.").

Applying the ESOI test in the instant action, the Court finds that Lt. Gipson has exhausted her administrative remedies with respect to all alleged adverse employment actions except the April 2018 disciplines. In her sole EEOC charge, Lt. Gipson described repeated threats on her job made by Maj. Fisher, which she alleged were a result of his discriminatory animus. The threats included "I will have you replaced," "I'll have your job" and "I'll make sure you're moved." The EEOC would naturally inquire as to whether Maj. Fisher made good on those threats, prompting investigation into Lt. Gipson's job placement, including shift assignments and any disciplinary actions. Similarly, Lt. Gipson's allegation of a retaliatory negative evaluation would reasonably prompt investigation into Lt. Gipson's employment record, including previous performance evaluations, and opportunities for advancement, including applications for promotion. CRC's failure to promote Lt. Gipson and her re-assignment to third shift would, therefore, be reasonably expected to fall within the scope of the EEOC's

investigation into her charge. *Cf. Maeder v. Hollywood Casino*, 97 F.Supp.3d 941, 945–46 (S.D. Ohio 2015) (holding that plaintiff's claim for discriminatory termination, which occurred during the pendency of an EEOC investigation into discriminatory discipline, was barred by a failure to exhaust administrative remedies because the termination arose from facts entirely separate from those included in the EEOC charge).

Lt. Gipson has failed, however, to exhaust her administrative remedies with respect to the April 16 and 17, 2018 disciplines—each issued more than three months after the EEOC closed its investigation into Lt. Gipson's charge and issued a Right to Sue letter. CRC's Motion for Summary Judgment as to all claims relating to the April 2018 disciplines is therefore **GRANTED**.

### B. Lt. Gipson's remaining claims fail on the merits.

The Court will now review the merits of Lt. Gipson's remaining claims. Title VII provides in relevant part that "it shall be an unlawful employment practice for an employer—to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII further prohibits discrimination against an employee "for attempting to protest or correct allegedly discriminatory conditions of employment"—*i.e.*, retaliation. 42 U.S.C. § 2000e-3(a); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 796 (1973).

A plaintiff can prove unlawful conduct through either direct or circumstantial evidence. Direct evidence is evidence "which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 924 (6th Cir. 1999). In the absence of direct evidence of discrimination or retaliation, such claims are analyzed under the *McDonnell*

*Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this approach, a plaintiff must first establish a *prima facie* case of discrimination or retaliation. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). Establishing a *prima facie* case creates a rebuttable presumption that the employer engaged in unlawful conduct. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 252–53. The burden is not onerous. An employer will satisfy its burden as long as it articulates a valid rationale for its decision. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

If a defendant presents a legitimate, non-discriminatory reason for the employment action, "a plaintiff will survive summary judgment only by raising a genuine issue of material fact as to whether the proffered reason is in fact a pretext for" unlawful discrimination or retaliation. *Walcott v. City of Cleveland*, 123 F. App'x 171, 176 (6th Cir. 2005). To establish pretext, a plaintiff must show that "the reason offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the decision . . . or (3) was insufficient to warrant the decision . . . ." *Id*. "In every civil rights action it is the responsibility of the jury [to] determine whether the defendant's actions were invidious, pretextual, or improperly motivated." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).

**1.    CRC is entitled to Summary Judgment on Lt. Gipson's race discrimination claims.**

Lt. Gipson does not offer direct evidence of race discrimination. The Court therefore utilizes the familiar *McDonnell Douglas* burden-shifting framework to evaluate her claim. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802, as modified by *Burdine*, 450 U.S. 248 (1981)). Lt. Gipson must establish a *prima*

*facie* case of intentional discrimination by showing that (i) she was a member of a protected class, (ii) she was qualified for her position, (iii) she suffered an adverse employment action, and (iv) she was treated differently than a similarly situated employee who was not a member of the protected class. *Id.* To show an adverse employment action in a race discrimination claim, a plaintiff "must establish that he has suffered a 'materially adverse' change in the terms or conditions of employment because of the employer's actions." *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999). A materially adverse change "'must be more disruptive than a mere inconvenience or an alteration of job responsibilities,'" and might be indicated by "'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002)).

CRC does not dispute that Lt. Gipson is a member of a protected class or that she was qualified for her position. CRC argues instead that Lt. Gipson's claims fail either because the employment actions do not constitute adverse employment actions or because she was not treated differently from a similarly situated non-class member. The Court will analyze each claim, in turn.

### a. *March 16, 2017 Performance Evaluation*

Lt. Gipson argues that her March 16, 2017 performance evaluation constitutes an adverse employment action. The Court disagrees. "In general, 'a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary.'" *White*, 533 F.3d. at 402 (quoting *Tuttle v. Metro. Gov't of*

*Nashville*, 474 F.3d 307, 322 (6th Cir. 2007)) (citations omitted). In other words, "to characterize a negative performance evaluation as an adverse employment action, the plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." *Id.* (holding that downgraded performance rank constituted an adverse employment action when such rank directly impacted plaintiff's pay for the following performance year) (internal quotation omitted). Lt. Gipson does not point to any such tangible employment action flowing from her receipt of a "Needs Improvement" mark in her competency summary. CRC's Motion for Summary Judgment on this claim is therefore **GRANTED**.

### b.    *March 23, 2017 Written Reprimand*

Lt. Gipson further argues that the March 23, 2017 written reprimand (issued by Warden Smith in response to her verbal altercation with Maj. Fisher) constitutes an adverse employment action. The Court again disagrees. Lt. Gipson offers no evidence that the discipline constituted or caused a change, let alone a materially adverse change, in the terms or conditions of her employment. As a result, CRC's Motion for Summary Judgment on this claim is **GRANTED**.

### c.    *Non-Selection for 2017 Captain Positions*

Lt. Gipson argues that her non-selection for a promotion to Captain constitutes an adverse employment action. Here, the Court agrees. *See White*, 533 F.3d at 402 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). The analysis, therefore, continues. In the context of a failure to promote claim, the Sixth Circuit has held that "in order to satisfy the fourth prong of the *prima facie* burden in a failure to promote case, it is incumbent upon the plaintiff to establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) (citing, *inter alia*, *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000))

(emphasizing that it is insufficient to point to a non-protected class member who was promoted where plaintiff was not, when plaintiff has not also proven that the two were similarly qualified).

CAPT 1. CRC argues that Lt. Gipson failed to satisfy the fourth element of the *prima facie* test with respect to CAPT 1 because Captain Church (the successful candidate) had advanced degrees in corrections-related fields and, because Lt. Gipson had none, the two did not have "similar qualifications." Captain Church had 19 years of experience at the time he was promoted. Lt. Gipson had nearly 24 years of experience as a member of the custody staff at CRC and nearly 18 years of experience as a Lieutenant. The minimum qualifications for the position of Captain equate twelve months of experience as a Lieutenant with three years of training in enforcement and twelve months of training in supervisory principles and techniques. Resolving all justifiable inferences in Lt. Gipson's favor, as it must, the Court finds that Lt. Gipson's longer tenure in the field renders moot the fact of fewer diplomas on her wall, and that she has similar qualifications as Captain Church. *See Plumb v. Potter*, 212 F. App'x 472, 479 (6th Cir. 2007). Lt. Gipson has therefore established a *prima facie* case that CRC engaged in discriminatory conduct when it did not select her for CAPT 1. Of course, the inquiry does not end there. The fact of Captain Church's educational credentials constitutes CRC's legitimate, non-discriminatory reason for hiring him, thereby rebutting any presumption previously created. As to whether this reason is pretext for discriminatory animus, Lt. Gipson offers only that "CRC has never hired a black female" for a Captain position. (Pl.'s Resp. to Def.'s Mot. for Sum. J. at 9.) Without more, this bare assertion does not call into question the credence of CRC's articulated reason for not selecting Lt. Gipson for CAPT 1. *See Hartsel*, 87 F.3d at n. 1.

CAPT 2. Lt. Gipson has also established a *prima facie* case of intentional discrimination against CRC with respect to CAPT 2, filled by Captain Sherrie Patrick. She has failed, however,

to raise a material question of fact as to whether CRC's articulated nondiscriminatory reason was pretext for discrimination. Lt. Gipson was not included in the Primary Applicant Pool for CAPT 2 and was therefore ineligible to proceed to the interview stage of the selection process. The Primary Applicant Pool was determined based on each applicant's score on the SME scoring form and the total number of applicants for the position, per ODRC policy. Lt. Gipson has not offered any evidence that calls the legitimacy of this process into question.

CAPT 3. Captain Michael Thompson was ultimately hired to fill CAPT 3. Captain Thompson, an African-American male, is a member of Lt. Gipson's protected class. She has therefore failed to make a *prima facie* showing of intentional discrimination based on her non-selection for CAPT 3.

CAPT 4. CRC again argues that Lt. Gipson's *prima facie* case with respect to CAPT 4 fails because Captain James White (the successful candidate) had an Associate's Degree and progress towards a Bachelor's Degree in corrections-related fields. However, the record shows that Captain White had only eight to nine years of experience working at ODRC at the time he applied for CAPT 4. (White Dep. 10:22–12:15.) The Court finds that Lt. Gipson has made a *prima facie* case of intentional discrimination with respect to CAPT 4. Nonetheless, her CAPT 4 claim fails because she has produced no evidence that CRC's articulated reason constitutes pretext for discrimination.

Because Lt. Gipson has failed to present any genuine issue of material fact as to whether CRC engaged in intentional race discrimination when it failed to promote her to Captain on four occasions in 2017, CRC's Motion for Summary Judgment on such claim is **GRANTED**.

### d.     September 2017 shift re-assignment

Finally, Lt. Gipson argues that her re-assignment to third shift in September 2017 constitutes an adverse employment action. Again, the Court disagrees. The Sixth Circuit has held that "absent changes in salary or the number of hours of work, scheduling matters would not normally classify as potential adverse employment actions." *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 450 (6th Cir. 2004). *See also Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (holding that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims"); *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987) (holding that plaintiff's reassignment to a position with the same rate of pay and benefits and without a material modification of her duties did not constitute an adverse employment action). Here, Lt. Gipson offers no evidence that re-assignment to third shift impacted her pay, benefits, or responsibilities. CRC's Motion for Summary Judgment on this claim is therefore **GRANTED**.

### 2.     CRC is entitled to Summary Judgment on Lt. Gipson's retaliation claims.

In the absence of direct evidence of retaliation, the Court will again utilize the *McDonnell Douglas* burden-shifting framework. *White*, 533 F.3d at 391. To make a *prima facie* case on her retaliation claim, Lt. Gipson must show that (i) she engaged in activity protected under Title VII; (ii) her exercise of that activity was known by CRC; (iii) she was thereafter subject to an adverse employment action; and (iv) there was a causal connection between the protected activity and the adverse employment action. *See Nguyen*, 229 F.3d at 563. "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Id*. The parties do not dispute that Lt. Gipson meets the first two prongs of the test. She engaged in protected activity when she filed her January 13, 2017 incident report and when she filed her EEOC charge on April 11, 2017, of which CRC was made aware on April 21, 2017. CRC instead argues that Lt. Gipson's

20

claims fail either on the third prong, because the employment actions do not constitute adverse employment actions, or on the fourth, because there is no causal connection to the protected activity.

As to the third prong, an "adverse employment action" here means any action that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). *See also Caterpillar Fin. Servs. Corp.*, 496 F.3d at 593–94 (noting that courts have taken pains to distinguish between an "adverse employment action" in discrimination versus retaliation claims). The term has a broader meaning in the retaliation context than in the discrimination context—as a result, an employment action that cannot sustain a *prima facie* case of intentional discrimination may be sufficient in a retaliation claim. *See Burlington Northern*, 548 U.S. at 64.

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen*, 229 F.3d at 563 (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) and *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984)). Such an inference may arise from evidence of defendant's different treatment of the plaintiff before and after she engaged in protected activity (*see Walcott*, 123 F. App'x at 178–79) or a close proximity in time between the protected activity and the adverse employment action. *See Spellman v. Ohio Dep't of Transp.*, 244 F.Supp.3d 686, 704 (S.D. Ohio 2017) ("'Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie*

case of retaliation . . . [but] where some time elapses . . . , the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.") (quoting *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

### a. *March 16, 2017 Performance Evaluation, March 23, 2017 Written Reprimand, and Non-Selection for 2017 Captain Positions*

Lt. Gipson alleges that her March 16, 2017 performance evaluation, March 23, 2017 written reprimand, and non-selection for the four open Captain positions in 2017 constitute retaliation for speaking out against Maj. Fisher. Assuming, *arguendo*, that Lt. Gipson has established a *prima facie* case of retaliation based on these employment actions, her claims nonetheless fail. As above, Lt. Gipson has failed to raise any question as to whether CRC's legitimate, non-discriminatory reasons were pretextual. CRC's Motion for Summary Judgment on these claims is therefore **GRANTED**.

### b. *September 2017 shift re-assignment*

Finally, with respect to her re-assignment to third shift in September 2017, the Court cannot conclude that Lt. Gipson has carried her burden to establish a *prima facie* case. The evidence of causation is too attenuated. There is no dispute that Maj. Nutter implemented the shift change. When he re-assigned Lt. Gipson, Maj. Nutter was unaware of Lt. Gipson's EEOC charge. Although it is unclear whether Maj. Nutter was aware of the January 13 incident report, filed four months before he came to CRC and eight months before he assigned Lt. Gipson to third shift, it is simply not reasonable to conclude without more that Maj. Nutter's decision was caused in any way by Lt. Gipson's protected activity. CRC's Motion for Summary Judgment on this claim is also **GRANTED**.

## IV.    CONCLUSION

In sum, Lt. Gipson's claim for sex discrimination is **DISMISSED**. Further, based on the evidence presented, the undersigned finds that a reasonable jury could not return a verdict in favor of Lt. Gipson such that CRC is entitled to judgment as a matter of law. CRC's Motion for Summary Judgment is **GRANTED**.


**IT IS SO ORDERED.**

/s/ *Sarah D. Morrison*
SARAH D. MORRISON
UNITED STATES DISTRICT JUDGE